AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

FILED
At Albuquerque NM
NOV 29 2018

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

710 DAN AVENUE SE APT 3,
ALBUQUERQUE, NM

Case No. 18-MR-1098

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ New Mexico _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 U.S.C. 841(a)(1) and (b)(1)(B) | Distribution of 50 grams and more of a mixture of substance containing methamphetamine and distribution of heroin. |

The application is based on these facts:
See attached

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

TFO Jerrod Pelot
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11-28-18

_____
*Judge's signature*

City and state: Albuquerque, NM

Kirtan Khalsa, U. S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE SEARCH OF
THE PROPERTY AND PREMISES LOCATED AT:
710 DAN AVENUE SE APT 3 ALBUQUERQUE, NM,
AS MORE FULLY DESCRIBED IN ATTACHMENT A.

AFFIDAVIT IN SUPPORT OF AN APPLICATION
UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

Your Affiant, Jerrod Pelot, having been first duly sworn, does hereby depose and state as follows:

1. I am currently assigned as a Task Force Officer employed by the Albuquerque Police Department and assigned to the Federal Bureau of Investigation (FBI). I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I have been assigned to the FBI since May of 2016. I am currently assigned to the Albuquerque Field Office, Safe Streets Task Force, which investigates Narcotics and Gang crimes.

AFFIANT TRAINING AND EXPERIENCE

2. I have been a law enforcement officer since 2008 and am currently employed by the Albuquerque Police Department and assigned to the Federal Bureau of Investigation (FBI) as a Task Force Officer. During my time in law enforcement, I have served in the capacity of Officer, Detective, Task Force Officer and Special Deputy U.S. Marshal. I have received hundreds of hours of formal training in the areas of gang and drug investigations from the federal, state, and local law enforcement agencies.

3. During my law enforcement career I have participated in hundreds of investigations involving narcotics violations, firearms violations, fugitives, property crimes, money laundering/ financial crimes, gang crimes/activities and the investigation of criminal enterprises. My investigative experience includes, but is not limited to, conducting surveillance, interviewing subjects, targets, witnesses, writing affidavits for and executing search and arrest warrants, acting in an undercover capacity, supervising cooperating sources, managing undercover agents, issuing administrative subpoenas, analyzing phone records, analyzing financial records, utilizing data derived from pen registers, trap and trace devices. Through my training and experience, I am familiar with the methods and means used by individuals and drug trafficking organizations to purchase, transport, store, and distribute controlled substances. I am also familiar with how those individuals and organizations hide the often substantial profits generated from their criminal activities.

1

## BASIS FOR AREAS TO BE SEARCHED
## AND ITEMS TO BE SEIZED

4. Through my training and experience I have learned that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking in their residences and areas surrounding their residences to include garages, carports, outbuildings, and vehicles parked on or near their property. Individuals involved in illegal drug trafficking have also been known to bury evidence underground on their property. This evidence, which is discussed in detail in the following paragraphs, includes drugs, scales, packaging material, records pertaining to drug transactions, and proceeds from drug sales.

5. I know that weapons (including rifles, shotguns, and handguns) are tools of the trade and instrumentalities of the crime of delivery and trafficking in narcotics.

6. Individuals involved in the possession and distribution of controlled substances possess items of identification, including but not limited to, driver's licenses, rent receipts, bills, and address books. These items are relevant to the identity of the possessor of the controlled substances or other drug trafficking related materials and occupants of the premises or vehicles searched.

7. Individuals involved in the distribution of controlled substances hide controlled substances in many places, including but not limited to, safes, lock boxes, vaults, inner walls, secret compartments, bathroom utilities, mattresses, vehicles, vehicle parts, outbuildings, and adjoining structures.

8. Individuals involved in the distribution of controlled substances collect proceeds from the sales and/or distribution of drugs to include bulk cash.

9. Individuals involved in drug trafficking commonly use certain items to package and prepare controlled substances for distribution. These items include, but are not limited to, packaging materials such as plastic baggies, plastic wrap, vacuum-seal bags, aluminum foil, electrical tape, duct tape, packing tape, and scales to weigh controlled substances.

10. Through my training and experience, I also know that drug dealers and members of drug trafficking organizations often utilize multiple cellular telephones to conduct their drug-related activities. These cellular telephones often contain names and phone numbers of other co-conspirators, text messages and emails utilized to direct and further their illicit activities, photographs and videos of controlled substances, drug proceeds, and firearms.

11. Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documents reflecting the sale of narcotics are maintained for long periods of time, even years, to memorialize past transactions. These documents include the status of accounts receivable and accounts payable, names and phone numbers of suppliers, customers, and co-conspirators, as well as other associates who may assist drug traffickers. These records

can be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets (drug ledgers), IOUs, miscellaneous notes, money orders, customer lists, and phone address books, both in hard copy or electronic form. These records are also frequently stored on cellular phones.

12. Records frequently include the identification of properties such as real property or vehicles owned, rented, leased, controlled, or otherwise utilized by the trafficker and their co-conspirators in the distribution of controlled substances. These records include property rental and ownership records such as deeds of trust, lease and purchase agreements, vehicle registration, rental, and ownership information; these items are often stored by drug traffickers on their person, residences and surrounding garages, outbuildings, carports, yards, vehicles.

13. Your Affiant submits this application and affidavit in support of a search warrant for the residence and premises of 710 Dan Avenue SE Apt 3, Albuquerque, NM (hereinafter referred to as SUBJECT PREMISES) to include any and all ~~outbuildings and vehicles parked on the property,~~ which is further described in Attachment A.

14. This affidavit will show that there is probable cause to believe that items in Attachment B, contain evidence of a violation of Title 21 U.S.C. §§ 841 (a)(1) and (b)(1)(B).

15. Title 21 U.S.C. §§ 841 (a)(1) and (b)(1)(B) establishes that it shall be unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance to include 5 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers.

16. The statements contained in the affidavit are based on my investigation, training, experience, and information provided by other law enforcement officers known to be reliable. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts I believe are necessary to establish probable cause to believe that evidences of a violation of Title 21 U.S.C. §§ 841 (a)(1) and (b)(1)(B) exist in items described in Attachment B.

## DETAILS OF THE INVESTIGATION

17. The FBI has been investigating the Sergio SAMANIEGO-VILLA Drug Trafficking Organization (SVDTO) since February of 2018. The investigation has included the controlled evidence purchase of approximately a half pound of a brown powdery like substance that field tested positive for heroin and one quarter pound of a white powdery substance that field tested positive for cocaine, during a buy-bust operation involving Jessica MOYA and Sergio SAMNANIEGO-VILLA. Since then, the FBI has been conducting a convert investigation of the SVDTO, to include the controlled purchases outlined below. Recently, on November 8, 2018, a federal grand jury indicted the

SAMANIEGO-VILLA and MOYA with conspiracy to distribute at least 100 grams and more of heroin (B-level) and cocaine, possession with intent to distribute heroin and cocaine, and, as to SAMANIEGO-VILLA, reentry of an illegal alien. Federal arrest warrants for SAMANIEGO-VILLA and MOYA have been issued, and agents have been conducting surveillance to locate them and arrest them where they are currently living in Fresno, California.

18. This investigation has included controlled evidence purchases utilizing an Undercover law enforcement officer (UC) to purchase narcotics directly from associates of the SVDTO on two separate occasions. These narcotics purchases were directed by SAMANEIGO-VILLA and MOYA by way of cellular communications to others to include Samuel RODRIGUEZ-VELAZQUEZ aka Bladimir ANGULO in Albuquerque, New Mexico.

### Controlled Evidence Purchase

### UC Buy Walk Operation #1

19. Beginning in April, 2018, FBI was working with a CHS who had obtained controlled substances from SAMANIEGO-VILLA and MOYA in the past. The CHS has provided your affiant with truthful and accurate information in the past that has assisted in other narcotics investigations. CHS was familiar with the physical characteristics of narcotics as well as how they were packaged and sold. CHS has two prior arrests for trafficking a controlled substance. The CHS was working for working for consideration of pending charges.

20. The CHS informed me that the CHS was communicating with SAMANIEGO-VILLA and MOYA on a certain telephone number. The CHS explained that he/she would call SAMANIEGO-VILLA, and would place an order for drugs. Sometimes the CHS would speak with MOYA and place the order with her. (SAMANIEGO-VILLA and MOYA are in an intimate relationship and have at least one child together.) The CHS explained that SAMANIEGO-VILLA and MOYA would then direct the CHS on where to meet the person for the drugs. During this time, it is believed that SAMANIEGO-VILLA and MOYA were primarily residing in California, though they would make intermittent trips to Albuquerque. CHS advised he/she has been purchasing drugs from SAMANIEGO-VILLA and MOYA for the last three years and has meet several times in person with both subjects while purchasing drugs from them. Through these drug purchases the CHS has spoken to both subjects over the phone on multiple occasions. CHS advised that it knows through voice recognition that he/she is communicating with SAMANIEGO-VILLA and MOYA when ordering the drugs.

21. On July 30, 2018, at the direction of the FBI, the CHS made a consensually recorded telephone call to SAMANIEGO-VILLA that is known to me and discussed purchasing methamphetamine from SAMANIEGO-VILLA. This call was made in the presence of FBI Task Force Officer (TFO) J. Pelot and Special Agent (SA) Michael Hansen.

22. On July 31, 2018, at the direction of law enforcement, the CHS once again contacted SAMANIEGO-VILLA by telephone for the purpose of arranging a controlled purchase of one ounce of methamphetamine and three ounces of heroin for a third-party purchaser. Unbeknownst to SAMANIEGO-VILLA, this third-party purchaser was a UC. The CHS instructed SAMANIEGO-VILLA on where to meet the CHS and UC in Albuquerque, NM. SAMANIEGO-VILLA estimated the delivery would arrive in approximately 40 minutes.  Surveillance was maintained on CHS and UC throughout this operation.

23. On July 31, 2018, federal and local law enforcement established surveillance at the trailer located at 9000 Zuni SE, trailer D23. Present at the trailer was a black Ford Fusion and a black Ford Edge SUV.

24. At approximately 1:15 p.m. the surveillance team observed a male individual take out the trash and enter a black Ford Fusion at the trailer.

25. At approximately 1:20 p.m. the surveillance team observed the black Ford Fusion leave the trailer driven by a male.

26. Continuous surveillance was conducted on the Ford Fusion as it drove directly to the predetermined buy location in Albuquerque. A male exited the vehicle and entered the UC/CHS vehicle through the back rear door. This male was identified as Bladimir ANGULO, whom was later identified upon his arrest as Samuel RODRIGUEZ-VELAZQUEZ, an associate and narcotics transporter for SAMANIEGO-VILLA.

27. The UC and RODRIGUEZ-VELAZQUEZ discussed money and the quantity ordered. The UC asked RODRIGUEZ-VELAZQUEZ about the "clear" (street terminology for methamphetamine). The UC received a plastic baggie containing approximately one ounce of suspected methamphetamine and there baggies containing approximately three ounces of suspected heroin from RODRIGUEZ-VELAZQUEZ and paid him for the narcotics.

28. At approximately 1:33 p.m., RODRIGUEZ-VELAZQUEZ exited the UC/CHS vehicle and got back into the black Ford Fusion, and left the area. Surveillance was maintained on RODRIGUEZ-VELAZQUEZ.

29. The Surveillance team observed the black Ford Fusion at Duke City Food Mart, near Central & Wyoming, in Albuquerque, NM. RODRIGUEZ-VELAZQUEZ was observed getting gas, and then followed back to the trailer.

30. The UC advised they conducted the controlled purchase directly with RODRIGUEZ-VELAZQUEZ. CHS and CHS' vehicle were searched before and after the controlled buy with negative results.



31. The purchased narcotics were sent to the regional DEA laboratory for testing. The baggie of suspected methamphetamine tested positive with a net weight of 27.59 grams with a purity level of 99% +/- 4 percent. The three baggies of suspected heroin tested positive for heroin with a net weight of 74.810 grams.

### UC Buy Walk Operation #2

32. In August 2018, another controlled drug buy was arranged between the UC and SAMANIEGO-VILLA. The UC had made a phone call to SAMANIEGO-VILLA on the same number on which the CHS had communicated with SAMANIEGO-VILLA in advance of the July 2018 controlled purchase. The UC and SAMANIEGO-VILLA discussed the purchase of methamphetamine and heroin at a later date.

33. On August 8, 2018, the UC called SAMANIEGO-VILLA and confirmed an order of four ounces of methamphetamine and three ounces of heroin for a total of $3,300 US Dollars during a consensually recorded phone call. SAMANEIGO-VILLA stated he needed to call someone to see how long it would take to arrange the delivery. SAMANIEGO-VILLA called back and stated it would be ready in 1.5 hours. SAMANIEGO-VILLA stated he would call back at that time. Surveillance was established at the trailer. The black Ford Fusion sedan was observed parked at the trailer.

34. A short time later, law enforcement observed the same black Ford Fusion observed on the prior drug deal depart the trailer. Law enforcement later confirmed that the vehicle was being driven by RODRIGUEZ-VELAZQUEZ. Law enforcement followed RODRIGUEZ-VELAZQUEZ to an apartment near Spain and Eubank and RODRIGUEZ-VELAZQUEZ was observed walking to unknown apartment swinging a grocery bag with an unknown object inside. After approximately 5 minutes, RODRIGUEZ-VELAZQUEZ was observed leaving the apartment in the same vehicle.

35. Law enforcement maintained surveillance on RODRIGUEZ-VELAZQUEZ as he did several errands, to include going to a gas station and the Shooters Den located on San Mateo NE.

36. RODRIGUEZ-VELAZQUEZ was then followed to the Southeast corner of Wyoming and Zuni and parked behind the business. RODRIGUEZ-VELAZQUEZ was observed meeting with a male subject driving a black GMC Denali pick-up truck, NM Plate 68002US. This subject was later positively identified as Jesus SAMANIEGO-VILLA AKA "CHUY" DOB: 12/24/1992. Jesus SAMANIEGO-VILLA went to the open driver's side door of the black Fusion and met with RODRIGUEZ-VELAZQUEZ. Both vehicles departed and RODRIGUEZ-VELAZQUEZ was followed back to the trailer.

37. The UC conducted a follow up phone call to Sergio SAMANIEGO-VILLA. At this time, a female answered and stated she is the "wife". Through this investigation, the wife of SAMANIEGO-VILLA has been positively identified as MOYA. MOYA stated she would contact the "guy" to see where he is at and will call back to have him meet the UC.



    I recognized the voice from this phone call to be that of MOYA based on a prior recorded phone call.

38. MOYA called back the UC and advised the delivery would be in 15 minutes at the pre-determined location in Albuquerque. Shortly thereafter the black Ford Fusion was observed leaving the trailer, and was followed to the predetermined meet location.

39. The UC was followed by Agents/ TFOs and arrived at the pre-determined location in Albuquerque and met with RODRIGUEZ-VELAZQUEZ in the black Fusion. RODRIGUEZ-VELAZQUEZ advised the UC that he does not have the narcotics and to follow him. It was determined RODRIGUEZ-VELAZQUEZ did in fact have the narcotics, and wanted to move the meet location in an attempt to identify law enforcement.

40. The UC and followed RODRIGUEZ-VELAZQUEZ down the street to a car wash located on San Mateo NE. RODRIGUEZ-VELAZQUEZ exited the Fusion and entered the passenger side of the UC vehicle. The UC advised RODRIGUEZ-VELAZQUEZ removed the methamphetamine from his front pocket and hands it to the UC. The UC then handed RODRIGUEZ-VELAZQUEZ the official funds and RODRIGUEZ-VELAZQUEZ handed the UC heroin from another front pocket. RODRIGUEZ-VELAZQUEZ then quickly counted out the cash before leaving. After a brief period of time RODRIGUEZ-VELAZQUEZ left the UC's vehicle and departed the area in the Fusion.

41. The UC met with SA Lopez Recci and TFO Pelot where they provided one baggy of suspected methamphetamine and one ziploc bag with three baggies of suspected heroin. The recording device was also recovered.

42. TFO Pelot and SA Lopez Recci submitted the recovered narcotics to evidence to the FBI Albuquerque Field Office.  The ziploc bag with the three baggies of brown substance was later field tested. The field test yielded a positive result for the presence of heroin and had a net weight of 79.1 grams.  The baggie with the clear substance was field tested. The field test yielded a positive result for the presence of methamphetamine and had a net weight of 116.3 grams.

43. The purchased narcotics were sent to the regional DEA laboratory for testing. The heroin tested positive with a net weight of 79.42 grams. As of this writing the methamphetamine results have yet to be returned.

44. On November 19, 2018, U.S. Magistrate Judge Jerry H. Ritter approved a federal arrest warrant for RODRIGUEZ-VELAZQUEZ charging him with violation of Title 21 U.S.C. §§ 841(a)(1), (b)(1)(B) distribution of 50 grams and more of a mixture of substance containing methamphetamine and Title 21 U.S.C. §§(a)(1),(b)(1)(C) distribution of heroin.

**Surveillance**

45. From April 2018, to present the FBI has conducted extensive physical and electronic surveillance of 9000 Zuni SE Trailer D-23, Albuquerque, NM. As part of this investigation, agents/TFOs had identified this location as a place of residence at which RODRIGUEZ-VELAZQUEZ and Fernando GOMEZ-MONTEZ aka Fernando GONZALEZ-TOPETE were residing. In August of 2018, Jesus SAMANIEGO-VILLA and other associates of the SVDTO were arrested. Shortly after the arrest of SVDTO associates, RODRIGUEZ-VELAZQUEZ switched vehicles and was observed driving a red Pontiac four door sedan.

46. At approximately 8:30 a.m. on November 15, 2018, FBI Agents/TFOs established surveillance at 9000 Zuni SE Trailer D-23, Albuquerque, NM. The red Pontiac four door sedan, NM plate AGWL96 (registered to a Bernice MIRABAL) was observed at the residence along with a black Ford Edge.

47. At approximately 2:50 p.m., the red Pontiac was observed leaving 9000 Zuni SE Trailer D-23, Albuquerque, NM and was followed by Agents/TFO's to 340 Charleston SE. Robert MEESE has been identified as residing at an apartment at this address. MEESE has a history of drug trafficking, and on a previous occasion the FBI observed a hand to hand narcotics transactions occur between RODRIGUEZ-VELAZQUEZ and MEESE. Toll analysis revealed that MEESE has had continuous and ongoing phone contact with SAMANIEGO-VILLA over the last 7 months. After arriving at MEESE's residence, RODRIGUEZ-VELAZQUEZ was observed parking on the street in front of that location and walking east towards the apartments in the direction of Meese's known residence. After approximately five minutes, RODRIGUEZ-VELAZQUEZ was observed walking back to his vehicle and left area.

48. Upon leaving 340 Charleston SE, RODRIGUEZ-VELAZQUEZ engaged in driving behavior consistent with counter surveillance. For example, RODRIGUEZ-VELAZQUEZ conducted U-Turns in the middle of the street, pulled off the roadway and waiting for vehicles to pass, turned into large parking lots and drove the perimeter. This behavior is consistent with driving patterns previously observed from RODRIGUEZ-VELAZQUEZ after he has conducted a narcotics transaction. After this behavior continued from RODRIGUEZ-VELAZQUEZ, the surveillance was terminated.

49. On November 26, 2018, Agents/TFOs conducted surveillance to determine RODRIGUEZ-VELAZQUEZ' current residence as part of the investigation, and to plan for the execution of the federal arrest warrant. Agents/TFO located RODRIGUEZ-VELAZQUEZ at the SUBJECT PREMISES. RODRIGUEZ-VELAZQUEZ was also observed at the SUBJECT PREMISES on November 27, 2018. On November 28, 2018, RODRIGUEZ-VELAZQUEZ was taken into custody outside the SUBJECT PREMISES. Subsequent to his arrest, RODRIGUEZ-VELAZQUEZ stated the SUBJECT PREMISES was his residence. The manager for the apartments where the SUBJECT PREMISES was located was interviewed and also stated that RODRIGUEZ-VELAZQUEZ had recently rented the apartment as the sole occupant.



50. Based on surveillance conducted on November 26, 27 and 28, RODRIGUEZ-VELAZQUEZ's statement the SUBJECT PREMISES was his residence, and the statement made by the apartment manager that RODRIGUEZ-VELAZQUEZ had recently rented the SUBJECT PREMISES your affiant believes that RODRIGUEZ-VELAZQUEZ had recently began residing at the SUBJECT PREMISES.

51. Based on my training and experience, subjects who engage in drug trafficking maintain evidence of drug trafficking at their residences to include items discussed in paragraphs four through twelve.

## CONCLUSION

52. It is believed through this investigation that RODRIGUEZ-VELAZQUEZ is a distributor of methamphetamine and heroin for the SVDTO, his residence is the SUBJECT PREMISES, and that there is evidence of drug trafficking located at the subject premises.

53. I submit that this affidavit supports probable cause for a warrant to search the SUBJECT PREMISES described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

Jerrod Pelot
FBI Task Force Officer/ Albuquerque Police Dept.

Subscribed and sworn to before me on November 28, 2018:

Kirtan Khalsa
United States Magistrate Judge

## Attachment A
## Premises to Be Searched

**710 Dan Avenue SE, Apt 3 Albuquerque, New Mexico**
~~To include any and all vehicles, outbuildings and sheds located at the above listed location.~~  *KK*

*kk*

The residence to be search_ed_ is a single occupancy apartment located at 710 Dan Avenue SE, Apartment 3. The building, pictured below, is located on the south side of Dan Avenue, between Walter and High St SE. The building is tan stucco in color with a green metal roof. The target apartment is the third apartment from north to south. The front door faces west, and has a white security gate affixed to the front. To the left of the front door in black lettering is the number "3". To the right of the front door is a large bay window.

(SUBJECT PREMISES)



## ATTACHMENT B
## ITEMS TO BE SEIZED

All evidence of violations of 21 U.S.C. § 841, Distribution of a Controlled Substance, including:

1) Controlled substances, including methamphetamine, heroin and cocaine.

2) Drug paraphernalia and packaging materials, scales, prescription boxes, hypodermic needles, plastic baggies, tin foil, or tape.

3) Books, records, receipts, notes, ledgers and other documents relating to transporting, ordering, purchasing, manufacturing and/or distributing controlled substances.

4) Financial documents, including credit card statements, tax returns, safe deposit records, safe deposit keys, bank records, bank statements, money orders, Western Union Money Gram or other currency transfer receipts, checking account records, cashier's checks, passbooks and other items evidencing the obtainment, concealment and/or expenditure of money.

5) Any and all drug customer lists, drug records, dealer lists, or any notes containing the individual names of such persons, telephone numbers, email addresses, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

6) Proceeds of violations of 21 USC § 841, including but not limited to, currency, jewelry, ~~vehicles~~ and other assets or financial records related thereto.

7) Cellular telephones and their contents, to include phone book or contacts list, call history, text messaging, audio/video files, photographs, and any other material stored on the telephones that is related to the above listed offenses.

8) ~~Telephone toll records for homes and or businesses owned or controlled by suspected co-conspirators, or other telecommunications instruments used by them and/ or their drug trafficking associates.~~ *KK*

9) Articles of property tending to establish the identity of persons in control of premises, ~~vehicles, storage areas, and container~~s being searched, including utility company receipts, rent receipts, addressed envelopes, and keys. *KK*

10) Photographs or video movies of the drug traffickers, their co-conspirators, and the property and assets purchased with drug proceeds.

11) Any and all firearms and or firearms related items to include but not limited to magazines, ammunition, and holsters.

12) SAFES, LOCKBOXES AND VAULTS THAT MAY CONTAIN CONTROLLED SUBSTANCES. *KK*